# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## NO. 22-13292-HH
_____

## UNITED STATES OF AMERICA,

## Appellee,

## v.

## SHERLEY BEAUFILS,

## Appellant.
_____

## Appeal from the United States District Court
## for the Southern District of Georgia
_____

## BRIEF OF APPELLANT
_____

**Laura D. Hogue**
Georgia State Bar No. 786090
Attorney for Appellant
Hogue Griffin, LLC
341 Third Street
Post Office Box 1795
Macon, GA 31202
(478) 750-8040
laura@hogueandhogue.com

**Jason Sheffield**
Georgia State Bar No. 638719
Attorney for Appellant
Peters, Rubin & Sheffield, P.A.
2786 N. Decatur Rd.
Suite 245
Decatur, GA 30033
(404) 296-5300
jasonsheffieldattorney@gmail.com

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,** :

    **Appellee,**               :

    **v.**                       :        **APPEAL NO. 22-13292-HH**

**SHERLEY BEAUFILS,**      :

    **Appellant.**          :

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to 11th Cir. R. 26.1, counsel for Appellant Sherley Beaufils hereby certifies that the following persons have an interest in the outcome of this case:

1.    Beaufils, Sherley, Appellant

2.    Bowen, Jr., Honorable Dudley H., Judge, United States District Court for the Southern District of Georgia

3.    Centers for Medicare and Medicaid Services

4.    Christine, Bobby L., former United States Attorney, Southern District of Georgia

5.    Clarkson, John Thomas, former Assistant United States Attorney, Southern District of Georgia

6.    Davids, Justin G., Assistant United States Attorney, Southern District of Georgia

7.    Epps, Honorable Brian K., Magistrate, United States District Court for the Southern District of Georgia

8.    Estes, David H., United States Attorney, Southern District of Georgia

9.    Hall, Honorable J. Randal, Chief Judge, United States District Court for the Southern District of Georgia

10.    Hogue, Laura D., appellate counsel for Appellant

11.    Knoche, Karl I., Assistant United States Attorney, Southern District of Georgia

12.    Lowther, Joshua Sabert, trial counsel for Appellant

13.    Porter, Jonathan Alan, Assistant United States Attorney, Southern District of Georgia

14.    Ray, Honorable Christopher L., Magistrate, United States District Court for the Southern District of Georgia

15.    Rhodes, Patricia Green, Assistant United States Attorney, Southern District of Georgia

16.    Sheffield, Jason B., appellate counsel for Appellant

17.    Spearman, Katryna Lyn, trial counsel for Appellant

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Sherley Beaufils notifies this Court that she does not request oral argument, in accordance with 11th Cir. R. 28-1(c).

# TABLE OF CONTENTS

Certificate of Interested Persons 2

Statement Regarding Oral Argument 4

Table of Contents 5

Table of Citations 6

Statement of Jurisdiction 9

Statement of the Issues 10

Statement of the Case 11

    (i)    Proceedings Below 11

    (ii)    Statement of Facts 12

    (ii)    Standards of Review 23

Summary of the Arguments 24

Arguments and Citations of Authority 27

    Argument A 27

    Argument B 39

    Argument C 47

    Argument D 54

Conclusion 62

Certificate of Compliance 64

Certificate of Service 65

# TABLE OF CITATIONS

**United States Supreme Court:**

*Molina-Martinez v. United States*, 578 U.S. 189, 136 S. Ct.

    1338 (2016)                                                34

*United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770 (1993)     33, 34

*Pioneer Investment Services Co. v. Brunswick Associates*

    *Limited Partnership*, 507 U.S. 380, 113 S. Ct. 1489 (1993)     57, 58

**Eleventh Circuit Court of Appeals:**

*Advanced Estimating System, Inc. v. Riney*, 130 F.3d 996

    (11th Cir. 1997)                                             61

*Cheney v. Anchor Glass Container Corporation*, 71 F.3d 848

    (11th Cir. 1996)                                           58, 59

*United States v. Arias*, 984 F.2d 1139 (11th Cir. 1993)     31

*United States v. Bailey*, 961 F.2d 180 (11th Cir. 1992)     43

*United States v. Doe*, 661 F.3d 550 (11th Cir. 2011)     23, 43, 48

*United States v. Fries*, 725 F.3d 1286 (11th Cir. 2013)     48

*United States v. Garcia-Bercovich*, 582 F.3d 1234 (11th Cir. 2009)     31

*United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019)     37, 38

*United States v. Jones*, 32 F.3d 1512 (11th Cir. 1994)     23

*United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013)     33, 37

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007)          49

*United States v. Monroe*, 353 F.3d 1346 (11th Cir. 2003)          38

*United States v. Moore*, 954 F.3d 1322 (11th Cir. 2020)          34

*United States v. Prather*, 205 F.3d 1265 (11th Cir. 2000)          30

*United States v. Rodriguez*, 398 F.3d 1291 (11th Cir. 2005)          33

*United States v. Scrushy*, 721 F.3d. 1288 (11th Cir. 2013)          23

*United States v. Smith*, 918 F.2d 1501 (11th Cir.1990)          23

*United States v. Starke*, 62 F.3d 1374 (11th Cir. 1995)          23, 33

*United States v. Stone*, 9 F.3d 934 (11th Cir. 1993)          31, 32, 35

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016)          49

*United States v. Waters*, 937 F.3d 1344 (11th Cir. 2019)          48, 52

*United States v. Williams*, 340 F.3d 1231 (11th Cir. 2003)          47

**United States Code:**

18 U.S.C. § 1028A          53

18 U.S.C. § 1035          52

18 U.S.C. § 1347          49

18 U.S.C. § 371          29, 35, 52

21 U.S.C. § 841          9

28 U.S.C. § 1291          9

42 U.S.C. § 1320a-7b(b)(1)          52

**United States Constitution**:

U.S. Const. art III, § 2                                    9

**Federal Rules of Appellate Procedure:**

Fed. R. App. P. 4(b)(1)(A)                                 9

Fed. R. App. P. 32(a)(7)                                  64

**Federal Rules of Criminal Procedure:**

Fed. R. Crim. P. 30(d)                                    33

Fed. R. Crim. P. 33(b)(2)                                 56

Fed. R. Crim. P. 45(b)(1)(B)                          55-57, 61

Fed. R. Crim. P. 52(b)                                    33

**Eleventh Circuit Rules:**

11th Cir. R. 26.1                                          2

11th Cir. R. 28-1(c)                                       4

**United States Sentencing Guidelines:**

U.S.S.G. § 3C1.1.                                     39, 42, 43

**Georgia Rules of Professional Conduct:**

Ga. R. Prof'l Conduct 1.2                                 62

Ga. R. Prof'l Conduct 1.16                                62

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

**A.** The United States District Court for the Southern District of Georgia had subject-matter jurisdiction of the action below because Appellant was charged with various violations of a federal criminal statute, 21 U.S.C. § 841.  U.S. Const. art III, § 2.

**B.** Jurisdiction of this appeal is proper in this Court pursuant to 28 U.S.C. § 1291 and Rule 3 of the Federal Rules of Appellate Procedure because it is an appeal from a final judgment of a district court.

**C.** A Notice of Appeal from the district court's final judgment was timely filed with the United States District Court for the Southern District of Georgia on September 28, 2022, as per the court's order extending the deadline for filing the motion until said date, in compliance with Rule 4(b)(1)(A) of the Federal Rules of Appellate Procedure.

**D.** This appeal is from a final judgment in a federal criminal action.

## STATEMENT OF THE ISSUES

**A.** The district court committed plain error by failing to give a jury instruction on deliberate ignorance, while permitting the Government to argue deliberate ignorance in a manner that was contrary to the law and that impermissibly shifted the burden of proof to the defense.

**B.** The district court committed clear error by imposing a two-level enhancement at sentencing for obstruction of justice.

**C.** The evidence was insufficient to support the verdicts as to all sixteen counts of conviction and was so tenuous as to the key element of intent that it would be a manifest miscarriage of justice for the convictions to stand.

**D.** The district court abused its discretion by denying the motion for new trial on the ground that the defense failed to show excusable neglect for the motion being untimely.

## STATEMENT OF THE CASE

### (i)  Statement of Proceedings Below

On February 23, 2021, a Superseding Indictment was returned against Appellant Sherley Beaufils in Case No. 1:20-CR-63, United States District Court for the Southern District of Georgia. The indictment charged Ms. Beaufils with conspiracy to commit wire and healthcare fraud, five counts of health care fraud, conspiracy to violate the anti-kickback statute and to make false statements in connection with a federal health care program, five counts of making false statements relating to healthcare matters, and five counts of aggravated identity theft. (Doc. 33)[1]. Attorneys Joshua Lowther (Doc. 12) and Katryna Spearman (Doc. 14) represented Ms. Beaufils at trial.

After a two-day trial in early 2022, the jury acquitted Ms. Beaufils of conspiracy to commit health care fraud but found her guilty of the remaining counts. (Doc. 100). The court sentenced Appellant to a total term of imprisonment of 87 months, with three years of supervised release, and ordered her to pay restitution in the amount of $1,635,161.61. The Amended Judgment was entered on August 22, 2022 (Doc. 124).

Ms. Beaufils retained undersigned counsel to represent her in the appeal of her convictions and sentence. Appellate counsel filed an out-of-time Motion for New Trial with the district court, asserting excusable neglect as the basis for the

---

[1] References to the district court docket are cited herein by the docket number as "(Doc. __)."

untimeliness of the motion. (Doc. 135). The district court had granted Ms. Beaufils

an extension of time until September 28, 2022, in which to file her Notice of

Appeal (Doc. 129), and appellate counsel filed a timely Notice of Appeal on that

date. (Doc. 139). The district court denied the Motion for New Trial, finding no

"excusable neglect" for its untimeliness. (Doc. 147).  Ms. Beaufils presently is

incarcerated at Marianna FCI.

**(ii)  Statement of Facts**

**Operation Brace Yourself**

The federal charges against Appellant Sherley Beaufils stemmed from a

joint investigation conducted by the Federal Bureau of Investigation (FBI) and

Health and Human Services (HHH) into a nationwide scheme known as

"Operation Brace Yourself." (T-142)[2]. According to FBI Special Agent Douglas

Dye, there were multiple components and co-conspirators to the scheme.

Telemarketers from certain call centers would cold-call Medicare patients and

offer free orthotic braces to them. (T-142). The telemarketers would collect

biographical and demographic information from the Medicare beneficiaries,

including information regarding their medical history and complaints. The call

centers would then put together packages called "leads," which leads would be

sold to a "broker." (T-143). The patient information in the leads would be loaded

onto a platform or portal called "DMERx," which could be accessed by other

---

[2] References to the trial transcript are cited herein by the volume and page number as "(T-page number)."

people who were part of the operation. (T-149).

The broker would then collaborate with a "telemedicine company." (T-143). The telemedicine company recruited physicians and nurse practitioners to review the patient records on the DMERx portal and to generate orders for the orthotic braces. (T-143). Orthotic braces are considered "durable medical equipment" or "DME." The signed orders were effectively prescriptions for the braces. The orders were necessary for Medicare to pay for the DME. (T-108). The DME orders had to be written by an authorized medical provider, either a physician or a nurse practitioner under the supervision of a physician, in order for Medicare to pay. (T-139-140). The medical provider could write an order for DME as long as the provider had been approved to participate in Medicare (T-106), the Medicare beneficiary was the provider's patient (T-115), the provider had examined the patient (T-128), the provider had a treatment plan for the patient (T-137), and the provider had determined that the equipment was medically necessary for the patient. (T-138).

Agent Dye testified that once an order was generated for an orthotic brace through the DMERx portal, the completed lead with the signed order would then be sold to a durable medical equipment company. The DME company would provide the brace to the patient and submit a claim to Medicare for reimbursement. (T-144). It was a violation of the Anti-kickback statute for DME companies to purchase such orders. (T-146).

**Sherley Beaufils**

Appellant Sherley Beaufils was born in Haiti, immigrated to the United States in 1986, and became a naturalized citizen in 2012. (T-276). Ms. Beaufils was licensed in Georgia as a registered nurse and as a nurse practitioner. (T-277). In 2018, she was working 12-hour shifts in emergency room medicine at Piedmont Newton Hospital in Covington. She lived in Conyers with her husband, Jean Beaufils (who was a licensed professional counselor), and their three daughters. (T-276).

In January 2018, Ms. Beaufils was contacted by a recruiter named Julixza Crim, who represented a telemedicine company known as Royal Physicians Network ("RPN"). (T-280). The recruiter told her that the company was looking for individuals to review patient charts prepared by the patients' treating physicians. (T-278). Ms. Beaufils took the part-time job to supplement her income; she was paid $25 per chart review. (T-279). According to Ms. Beaufils, her job description only entailed reviewing charts, which charts she believed had been prepared by the treating physicians of the patients and which charts included written orders for DME. (T-281). Ms. Beaufils believed that the physicians would have the final sign-off on the charts and DME orders after she reviewed and approved them. (T-281).

It was Ms. Beaufils' understanding that she would not be providing any nurse practitioner services for the patients whose charts she reviewed. If she was

going to be working as a nurse practitioner, she would have been required to sign a

power of attorney to give RPN the right to bill Medicare on her behalf. (T-282). It

was also her understanding that a nurse practitioner could not prescribe DME

except under the supervision of a physician. RPN never asked her to be a medical

provider for the patients. Her job was only to review the charts. (T-288). Among

other things, Ms. Beaufils reviewed the charts for inconsistencies, grammatical

errors, and to check whether the particular device ordered matched the patient's

chief complaint. (T-297).

     As part of the training process when she was first hired, Ms. Beaufils

watched a YouTube video to familiarize herself with the DMERx portal that she

would be required to use for her chart review. (T-284). She would typically receive

an email from RPN alerting her that there was a chart or charts in the portal for her

review. (T-285). After logging into the DMERx portal, she would click on the

name of the patient and his or her chart would appear on the screen. The patient's

chart included biographical and demographical information, set forth the patient's

complaint or complaints, described the patient's medical examination including

where and when it took place, and provided the name of the medical provider who

performed the exam. (T-287, 289-290). The chart also included an order for DME

and an attestation from the patient's medical provider that the particular brace or

piece of DME ordered for the patient was a medical necessity. (T-290). As Ms.

Beaufils understood, such attestation of medical necessity had to come from a

physician, and not a nurse practitioner, as per Section 6407 of the Affordable Care Act. (T-290).

The charts that Ms. Beaufils reviewed on DMERx were already "pre-populated" when she pulled them up on the portal. There was nothing that she needed to do other than the chart review, described above. (T-285). If the information did not look correct or she needed more information, she would send an email to RPN explaining why she could not approve the chart. (T-292). For example, if a patient indicated he had back pain and the DME order was for a knee brace, Ms. Beaufils would not sign off on the chart. She would put the chart back into the system and ask someone else to check on the problem. (T-298).

Similarly, if there was anything missing in the chart, Ms. Beaufils would send the chart back and notify RPN of the omissions. This can be seen in an email introduced as an exhibit at trial by the Government, in which Ms. Beaufils notified Julixza Crim at RPN that a certain patient chart indicated that a shoulder brace had been prescribed but the shoulder component was not completed on the examination notes. (T-180; Govt. Exh. 1G). If the information in the patient's chart looked accurate and the statement of medical necessity was appropriate for the patient's complaints, then it was a "complete chart" and Ms. Beaufils would sign off on it. (T-298). This was done by clicking on an attestation that the information was true and correct to the best of her knowledge, which she based upon her review of the chart. (T-301).

Ms. Beaufils always assumed that the medical provider who performed the patient's exam, prescribed the brace, and attested to the medical necessity of the brace, would sign off on the documents after she determined that it was an accurate and "complete chart." (T-306). The medical guidelines would have required the patient's treating physician to have the final review of the documents and to sign off on what she had reviewed for accuracy, including the prescription for the DME. (T-306). Once Ms. Beaufils marked the chart "complete," she had no further contact with it. She never saw the final paperwork submitted to a DME company to obtain the brace or to Medicare for payment of the claim.

Since reviewing the charts was just a second, part-time job, Ms. Beaufils would do the reviews whenever she had the time to do them. She often performed her chart reviews in the early mornings. She could open the charts, review them, and, later, if anything was missing, send an email to RPN telling them what was needed before the chart could be considered complete. (T-282). Her job did not require her to review any set number of charts. During the fourteen months that she worked for RPN, she received approximately $37,000 to $38,000 in compensation for her review of patient charts (T-299).

Approximately twelve months after Ms. Beaufils began doing chart reviews for RPN, she received a phone call from Cigna. Cigna told her that it needed more documentation on a claim involving an order that she had written for orthotic braces. (T-292). Ms. Beaufils asked the insurer for the name of the physician on

the order; Cigna told her that her name was the only name on the order. (T-292). Ms. Beaufils was immediately concerned since she knew that, as a nurse practitioner, she could not be the sole medical provider on anyone's claim for DME. (T-293). Ms. Beaufils contacted RPN and told them that she needed to speak with the owner because she believed her license had been compromised. The company gave her the "run-around" for several weeks. (T-293). When they failed to respond to her, Ms. Beaufils felt like she had to create a sense of urgency to make them speak with her about the situation, so she asked if they were putting her name on charts of fictitious patients. (T-307). After this, Ms. Beaufils was finally able to get a telephone conference with Charlene Frame, the owner of RPN. (T-307).

In the phone call, Frame told Ms. Beaufils that she would call Cigna and clear up the problem. Frame asked Ms. Beaufils who had recruited her to work for their company. When Ms. Beaufils told her that Julixza Crim was the recruiter, Frame said that Julixza had been fired for committing fraud. (T-294). Ms. Beaufils informed Frame that she needed to know the full process and what happened to the charts after she reviewed them. Specifically, she wanted confirmation that the charts went back to the patient's physician for a final review and for the physician to sign off on them after Ms. Beaufils' review. According to Ms. Beaufils, Frame assured her that they did. (T-294).

Ms. Beaufils testified that she finally resigned from RPN a few weeks after she received the call from Cigna because the company could never explain why Ms. Beaufils had been listed as the sole medical provider for the patient associated with the Cigna claim. (T-295). RPN also had started asking for Ms. Beaufils' DEA number, which she refused to provide. (T-296). These concerns that led to her resignation turned out to be valid because—unbeknownst to Ms. Beaufils— the charts and orders reviewed and approved by Ms. Beaufils on DMERx were ultimately submitted to Medicare, listing her as the ordering provider and as the practitioner who performed the patient examinations. (T-118, 150-151).

**Investigation of Ms. Beaufils**

As part of Operation Brace Yourself, the FBI was monitoring claims to Medicare for DME and looking for ordering practitioners with a substantial number of claims. They were also looking to see whether these ordering practitioners had submitted claims to Medicare for their examinations of the patients who were prescribed DME. (T-147-148). According to FBI Special Agent Dye, Ms. Beaufils appeared on the FBI radar when they noticed a dramatic spike in DME claims to Medicare listing her as the ordering practitioner. (T-147). Ms. Beaufils worked for RPN during the time period from March of 2018 to December of 2019. Before her employment, no claims were submitted to Medicare for DME naming her as the ordering provider. (T-147). During the fourteen months of her employment, claims were made to Medicare for 3,800 items of DME, listing Ms.

Beaufils as the ordering provider. (T-118). No claims were submitted to Medicare by Ms. Beaufils for any examinations of the patients who were prescribed DME. (T-148).

After learning that the DMERx portal was being used to facilitate orders for the braces in Operation Brace Yourself, the FBI served a subpoena on DMERx and obtained all DME orders naming Ms. Beaufils as the ordering practitioner as well as the medical charts for those patients. (T-149). The records subpoenaed from DMERX showed Ms. Beaufils' electronic signature on the orders for the 3,800 items of DME for which claims were made to Medicare. The final charts also indicated that Ms. Beaufils was the medical provider who had examined the patients and attested to the medical necessity for the devices. (Govt. Exh. 1).

The records showed that most of the patients received multiple braces (T-150), and the braces ordered were typically the same type of back, shoulder, elbow, and wrist braces. (T-120, 124). The Medicare claims naming Ms. Beaufils as the ordering practitioner were for braces supplied by 57 different DME companies. Medicare paid the suppliers approximately $1,600,000 for the claims. (T-118-119). The FBI also interviewed several of the patients whose DME orders listed Ms. Beaufils as the provider and obtained copies of their medical records from their treating physicians. At the conclusion of the investigation, Ms. Beaufils was charged with, among other things, conspiracy to commit healthcare fraud and five substantive counts of healthcare fraud in connection with five patients included in

20

the DMERx records whose DME orders listed Ms. Beaufils as the ordering practitioner.

**Evidence at Trial**

Other than the testimony from Agent Dye and the Government's Medicare expert, the bulk of the Government's evidence at trial consisted of testimony from the five patients and/or their family members and the treating physicians of the five patients named in the indictment, which testimony showed that Ms. Beaufils had not examined the patients and that the information contained in the patients' charts was false. For example, the Government presented testimony that one of the five patients with DME orders listing Ms. Beaufils as the provider was in hospice care at the time of the alleged exam and was deceased at the time the DME order was initiated (T-163-167)**.** The medical chart for another one of the five patients showed a knee exam and maneuver on a patient whose leg had been amputated below the knee six months earlier. (T-203-210).

Additionally, the Government presented evidence from two people who had entered guilty pleas in connection with Operation Brace Yourself, neither of whom knew Ms. Beaufils. (T-224). One of the witnesses, Dr. Salim, was a physician who had worked for another telemedicine company involved in the conspiracy and who had used the DMERx portal. (T-227). At the Government's request, he had taken screen shots of the DMERx portal for patients whose charts he reviewed. (T-229). His description of the portal was almost identical to Ms. Beaufils' description of

21

how the portal worked. Dr. Salim testified that he would log in to DMERx, click on a patient's name, and see the biographical and demographical information for that patient. (T-228). He could also see the patient's chief complaint, a description of the physical examination of the patient, the medical attestation form, and the order for the DME. (T-228). All of this information was pre-populated, just as Ms. Beaufils had explained. (T-228, 230, 236). However, unlike Ms. Beaufils, Dr. Salim testified that he knew that, by approving the chart, he was generating a DME order under his name for braces for people he had never met. He admitted having knowledge that he was participating in Medicare fraud. (T-227-228).

The only other Government testimony came from its rebuttal witness, Charlene Frame, the owner of RPN. She had also entered a guilty plea to conspiracy to commit Medicare fraud. (T-322). Frame testified that she had never told Ms. Beaufils that the patients whose charts she reviewed had been examined by other medical providers—even though Ms. Beaufils never testified that Frame was the person who had told her this. (T-323).

When the FBI first came to Ms. Beaufils' home to interview her, Ms. Beaufils told Agent Dye from the outset that she had been hired by RPN only to review patient charts. All of the charts had DME orders attached to them. If there were no problems with the chart or the accompanying DME order, she attested to this fact on the DMERx portal and was thereafter paid $25 for each completed chart. (T-310-313). If there was a problem with the chart, then she put the chart

22

back into the system and was not paid for that review. There was nothing about the charts to lead Ms. Beaufils to believe that someone other than a qualified medical professional had prepared the charts that she reviewed. (T-289).

### (iii) Standards of Review

A.    When a defendant does not specifically object to a jury instruction before the jury retires, any challenge to the instruction will be reviewed for plain error. *United States v. Starke*, 62 F.3d 1374, 1380-81 (11th Cir. 1995).

B.    In considering whether the district court erred in imposing the obstruction-of-justice sentencing enhancement, this Court reviews for clear error the court's factual findings and *de novo* its application of those findings under the sentencing guidelines. *United States v. Doe*, 661 F.3d 550, 565 (11th Cir. 2011).

C.    In cases in which the defense fails to renew a motion for judgment of acquittal at the end of the presentation of all of the evidence, this Court will review the sufficiency of evidence using a manifest miscarriage of justice standard. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994).

D.    A district court's denial of a motion for new trial is reviewed for abuse of discretion. *United States v. Scrushy*, 721 F.3d. 1288 (11th Cir. 2013). See also, *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir.1990) (a district court's denial of any motion on the grounds of untimeliness is reviewed for abuse of discretion).

## SUMMARY OF ARGUMENTS

**A.** Both sides requested a jury charge on deliberate ignorance as proof of
knowledge. Neither side realized that the court's final charges omitted any
mention of deliberate ignorance. The Government argued deliberate ignorance
in closing, misstating the law and impermissibly shifting the burden of proof to
Appellant. The jury was never told that the burden was on the Government to
prove deliberate ignorance beyond a reasonable doubt. The court's failure to
give the jointly requested instruction on deliberate ignorance, particularly in
light of the improper closing argument, amounted to plain error.

**B.** Over defense objection, the district court applied a two-level enhancement at
sentencing for obstruction of justice. The court's sole reason for applying the
enhancement was its finding that Ms. Beaufils had committed perjury at trial.
U.S. Probation and the Government both argued that testimony from
Government witness Charlene Frame had refuted some of Ms. Beaufils'
testimony and that Ms. Beaufils' testimony conflicted with what she told the
FBI in an interview. However, a close look at the testimony of Charlene Frame
and at the cross-examination of Ms. Beaufils regarding her prior interview
reveals that she had not changed her story materially and that her testimony did
not conflict with that of Ms. Frame. There simply was no evidence to support a

finding of perjury, making such finding clear error, rendering the application of the enhancement erroneous.

**C.** The Government failed to prove that Ms. Beaufils knew that RPN was committing Medicare fraud or that Ms. Beaufils had the requisite intent to participate in the commission of Medicare fraud or the other charged offenses. Ms. Beaufils was told and at all times believed that her job was merely to review patient charts with orders for braces, to approve or disapprove the files based upon any inaccuracies or missing components, and that the final orders would be signed by the treating physicians. The Government failed to carry their burden of proving the key elements of knowledge and intent; therefore, the convictions amount to a manifest miscarriage of justice.

**D.** One week after the jury found her guilty, Ms. Beaufils communicated with her trial counsel, expressly telling him to file a motion for new trial as soon as possible so that he could introduce critical items of exculpatory evidence that he had failed to do at her trial. Trial counsel refused to file the motion, simply telling her she had no grounds for a motion for new trial—without advising her that she could obtain substitute counsel to file the motion and that she only had seven remaining days in which to file it. Ultimately, she hired other appellate counsel who filed an untimely motion for new trial, asserting excusable neglect. The court denied the motion for being untimely without evaluating the merits of

the any of the numerous claims of ineffective assistance of counsel. This violation of ethics substantially harmed Appellant by denying her the ability to present to the district court her exculpatory evidence and to create the record necessary for appellate review. This failure to act on the part of Ms. Beaufils' attorney satisfied the conditions necessary for a finding of excusable neglect. The district court's finding otherwise constitutes an abuse of discretion.

## ARGUMENTS AND CITATIONS OF AUTHORITY

**A. The district court committed plain error by failing to give a jury instruction on deliberate ignorance, while permitting the Government to argue deliberate ignorance in a manner that was contrary to the law and that impermissibly shifted the burden of proof to the defense.**

### Pertinent Facts

Prior to trial, defense counsel and counsel for the Government filed a document entitled "Joint Requests to Charge." (Doc. 84). In it, both parties requested a modified charge on deliberate ignorance, as follows:

**S8 (modified)**

**Deliberate Ignorance as Proof of Knowledge**

If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist.

"Deliberate avoidance of positive knowledge" – which is the equivalent of knowledge – occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.

But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that the Defendant knew about the possession of the controlled substance.

(Doc. 84; p. 42).

One of the main issues for the jury to decide was Ms. Beaufils' intent and whether she knowingly and willfully participated in a scheme to defraud Medicare. Did Ms. Beaufils believe she had been hired solely to review charts and DME orders prepared by other providers, as she testified, or did she know that she was generating orders under her name for patients she had never examined as part of a scheme to defraud Medicare?

The district court prepared and distributed its 27-page written proposed jury charge to the parties prior to the beginning of closing arguments. (Doc. 95; T-327-328). The charge that the district court prepared omitted any instruction on the concept of deliberate ignorance. (Doc. 95). It did not include either the pattern charge for deliberate ignorance or the slightly modified charge requested by both the Government and the defense. It is unclear from the record whether the court intentionally or inadvertently omitted the jointly requested charge on deliberate ignorance. There was no charge conference on the record, only this statement by the Court to the attorneys before the start of closing arguments:

THE COURT: Counsel, I'll tell you one thing I did is to consolidate the general information about the conspiracy charges. I didn't want to

28

define conspiracy twice. I have done that in the past and I think it's confusing and I think it is hard on my voice. So that is the only significant change that's involved.

(T-327-328). Apparently neither party noticed the absence of the jointly requested charge on deliberate ignorance, and neither party brought the absence of the requested charge to the court's attention.

The Government was then called to present its closing argument. (T-328). Despite the absence of a deliberate ignorance charge in the Court's 27-page written charge, the Government's last words to the jury in the final portion of its closing argument were the following:

> The last thing I want to talk to you about is called deliberate ignorance, which is what the judge is going to charge you about. It's sometimes called the ostrich defense. It is just sticking your head in the sand when you should be asking questions. When she is telling you that she received orders that were already filled out that talks about these exams that had been done and her—the pronoun 'I' is all through those documents saying I did this and I did that and she knew she didn't do it, she should have been asking questions and she didn't, and she is guilty of all the counts in the indictment.

(T-370-371).  There was no objection by defense counsel to this erroneous statement of the law.

Following the Government's final closing, the court asked the bailiff to hand out a copy of the written charge to each juror (T- 371), and then the court charged the jury, consistent with the written charge, omitting any mention of "deliberate ignorance." (T- 372-398). There were no exceptions or objections to the charge by

29

either the Government or defense counsel. (T- 396). Ms. Beaufils shows that the Government's closing argument as to deliberate ignorance incorrectly stated the law and impermissibly shifted the burden to Ms. Beaufils, and that the district court's failure to charge the jury with the correct law on deliberate ignorance constituted plain error.

## Law and Arguments

**Deliberate Ignorance**

The "knowledge element of a violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). A jury instruction on deliberate ignorance "is based on the alternative to the actual knowledge requirement at common law that if a party has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge." *Prather*, 205 F.3d at 1270 (quoting *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991)). This Court's pattern jury instruction for "Deliberate Ignorance as Proof of Knowledge" is set out in Special Instruction Number 8 of the *Eleventh Circuit Pattern Jury Instructions, Criminal Cases*. The pattern charge is nearly identical to the modified charge on deliberate ignorance both parties jointly requested.

A deliberate ignorance instruction is "appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the

30

fact in question and purposely contrived to avoid learning all of the facts in order

to have a defense in the event of a subsequent prosecution." *United States v.*

*Garcia-Bercovich*, 582 F.3d 1234, 1237 (11th Cir. 2009). According to this Court,

"where the evidence supports both actual knowledge and deliberate ignorance, the

instruction is properly given." *United States v. Arias*, 984 F.2d 1139, 1143 (11th

Cir. 1993).

Typically, the issue on appeal is whether the district court erred by giving an

instruction on deliberate ignorance, either with or without an objection from the

defense at trial. While that is not the situation here, since both parties requested a

jury charge on deliberate ignorance and the district court either inadvertently or

intentionally failed to give the charge, some of the significant cases that highlight

the problems with the very concept of deliberate ignorance are instructive to this

analysis.  In *United States v. Stone*, 9 F.3d 934, 936 (11th Cir. 1993), this Court

engaged in a detailed review of a deliberate ignorance instruction and questioned

when the misuse of the instruction would demand a reversal. The *Stone* Court had

to decide whether it was reversible error for the district court to charge the jury on

"deliberate ignorance" in the absence of sufficient evidence to support such a theory.

The *Stone* Court concluded that any error in giving a deliberate ignorance

charge in the absence of sufficient evidence is harmless when the instruction itself

**requires,** as a precondition to its application, **proof beyond a reasonable doubt of**

**deliberate ignorance**. *Stone*, 9 F.3d at 941-942 (emphasis added). "Because the

deliberate ignorance instruction used by the trial court clearly stated the proper legal standards for the jury to apply, and because by its own terms the instruction did not apply if there was insufficient evidence to prove deliberate ignorance beyond a reasonable doubt, there is no reason to believe that the jury convicted Stone on a deliberate ignorance theory for which there was insufficient evidence. The giving of the deliberate ignorance instruction was therefore harmless error." *Id*. Thus, the critical factor to this Court was the language in the charge that **the Government had to prove deliberate ignorance beyond a reasonable doubt**. The *Stone* opinion also noted the concerns of other circuits regarding the potential problems with a deliberate ignorance charge: "First, they have expressed concern that absent evidence to support the instruction juries will misunderstand it and **will incorrectly employ a negligence or recklessness standard**, thereby relieving the government of its constitutional obligation to prove the defendant's knowledge beyond a reasonable doubt, and potentially shifting the burden of proof to the defendant." *Stone*, 9 F.3d at 939-940 (internal citations omitted)(emphasis added).

**Plain Error**

Ms. Beaufils shows that the district court's failure to give the requested charge on deliberate ignorance, after allowing the Government to incorrectly argue the law as to deliberate ignorance in closing, constituted plain error. Since trial counsel failed to object to the charges as given by the district court and to the absence of the jointly requested charge on deliberate ignorance (T-396), Ms.

Beaufils' challenge to the court's failure to give the requested instruction will be reviewed for plain error. *United States v. Starke*, 62 F.3d 1374, 1380-81 (11th Cir. 1995). See also, Fed. R. Crim. P. 30(d), 52(b) (failure to object to the court's giving of a jury instruction or the court's failure to give a requested instruction limits appellate review to plain error review).

"The plain-error test has four prongs: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013). While the Supreme Court has instructed that it is a "daunting" and "difficult" task to prove plain error and that plain error review should be exercised "sparingly" by appellate courts, see *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005), Ms. Beaufils shows that this is one of those rare cases in which the appellant can satisfy all four prongs of the test and meet the burden of proving plain error.

The first two prongs of the plain-error test are easily satisfied here. There was an error that was plain and obvious. See, *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770 (1993) ("Plain error" also means that the error is "clear" or "obvious" under the current law). In this case, both parties requested an instruction

on deliberate ignorance. Ms. Beaufils testified that while she now agreed that RPN was not a legitimate operation, she did not review patient charts with the knowledge or intent that she was participating in a Medicare fraud scheme. The Government's argument was that Ms. Beaufils <u>had</u> to know that her activities were illegal and were for the purpose of helping RPN execute a nationwide, multi-million dollar fraudulent scheme. But, since the Government had no direct evidence of her knowledge and intent, nor any overwhelming circumstantial evidence of those key elements of the offense, the Government needed to argue the concept of deliberate ignorance.  Given the two competing theories, the district court's failure to give the jointly requested charge was plain and obvious, particularly after the Government was permitted to mis-state the concept of deliberate ignorance in its final closing argument.

As to the third prong of the plain-error test, the error must have affected Ms. Beaufils' substantial rights. *United States v. Moore*, 954 F.3d 1322, 1337 (11th Cir. 2020). Under this prong, the appellant bears the burden of persuasion in establishing a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Olano*, 507 U.S. at 734; see also, *Molina-Martinez v. United States*, 578 U.S. 189, 136 S. Ct. 1338, 1343 (2016). This Court may consult the entire record when evaluating an error for its effect on a defendant's substantial rights. *Moore*, 954 F.3d at 1337. When the record is

34

reviewed as a whole, there is a reasonable probability that, but for the district court's failure to instruct the jury as to the correct law on deliberate ignorance, the outcome of Ms. Beaufils' trial would have been different.

Even when charged correctly, the deliberate ignorance instruction is rife with the potential for jury confusion and the improper use of a negligence or recklessness standard, "thereby relieving the government of its constitutional obligation to prove the defendant's knowledge beyond a reasonable doubt, and potentially shifting the burden of proof to the defendant." *Stone*, 9 F.3d at 939-940. These concerns are directly on-point when applied to the Government's final words to the jury in Ms. Beaufils' case, immediately prior to the administration of the jury charge:

> Ladies and gentlemen, the last thing I want to talk to you about is called deliberate ignorance which is what the Judge is going to charge you about. It's sometimes called the ostrich defense. It is just sticking your head in the sand when you should be asking questions. … she should have been asking questions and she didn't, and she is guilty of all of the counts in the indictment and we ask you to return a verdict which reflects the truth of this matter.

(T-370-371). The Government's explanation of deliberate ignorance not only omitted critical language requiring proof of deliberate ignorance beyond a reasonable doubt but also erroneously shifted the burden to Ms. Beaufils to affirmatively take some action to discover the illegality of her behavior. The jury was never instructed that the burden was solely on the Government to prove

deliberate ignorance beyond a reasonable doubt and not on Ms. Beaufils to disprove.

Here, the harm in these uncorrected misstatements of the law become even weightier given the lack of evidence that Ms. Beaufils had actual knowledge that RPN was engaged in a fraudulent enterprise and that she was part of it. The Government did not introduce any email, text message, phone call, note, or document authored by Ms. Beaufils, or received by Ms. Beaufils, that demonstrated some knowledge by her that the company was operating a scam. To the contrary, all of the Government's communications entered into evidence presented a company with an official looking letterhead, impressive advertising, sophisticated software and website, payment for her work by company check (not cash), proper IRS forms filed by RPN demonstrating the income they paid to Ms. Beaufils, and email communications in which Ms. Beaufils was conveying information back to RPN when an examination—purportedly dictated by a physician—did not comport with the diagnosis or prescription for durable medical equipment. And, significantly, there was not a single witness who testified—even under advantageous plea deals with the Government—that he or she ever had a conversation with Sherley Beaufils in which she was advised that the whole thing was a sham, or that no real doctor was performing the examinations.

A jury's use of "deliberate ignorance" to substitute for actual knowledge is only appropriate if the Government had been able to prove—beyond a reasonable

doubt—that Ms. Beaufils *suspected* that she was participating in an illegal scheme and then *took affirmative steps not to confirm* that suspicion. This is precisely why the Government's closing argument concerning deliberate ignorance had the likelihood of significantly impacting the jury's verdict. The prosecution essentially told the jury that Ms. Beaufils had a duty to seek out any potential illegality with RPN and that her **negligence** in not asking more questions meant that she was guilty on all counts of the indictment. Without any instruction from the court as to the correct law on deliberate ignorance, it is highly probable that the jury convicted Ms. Beaufils on all sixteen counts using an improper negligence standard, affecting her substantial rights and satisfying the third prong of the plain-error test.

Lastly, as to the fourth prong of the test, Ms. Beaufils asserts that the harmful error resulting from the court's failure to instruct the jury properly on the law of deliberate ignorance in her case is the type of error that seriously "affects the fairness, integrity, or public reputation of judicial proceedings," see *Madden*, 733 F.3d at 1320, and she urges this Court to exercise its discretion to correct the district court's plain error. "The determination whether to exercise discretion to correct the error inherently requires a case-specific and fact-intensive inquiry." *United States v. Hawkins*, 934 F.3d 1251, 1267 (11th Cir. 2019) (internal citations omitted). As stated in the *Hawkins* opinion, the purpose of this fourth element of plain error review is "to analyze whether a reasonable citizen would bear a rightly diminished view of the judicial process and its integrity if the court refused to

correct the alleged error." *Hawkins*, 934 F.3d at 12568 (internal citations omitted). In analyzing this fourth element, "the United States Supreme Court has often rested its determination on the amount of evidence incriminating the defendant, regardless of the error." *United States v. Monroe*, 353 F.3d 1346, 1357 (11th Cir. 2003).

There was no evidence to connect Sherley Beaufils to the charge that she was a co-conspirator with any of the master-minds or even minor players of this national Medicare fraud operation, as evidenced by the jury's verdict of not-guilty to Count One, charging her with conspiracy. Furthermore, while there was an abundance of evidence showing that RPN was engaged in healthcare fraud, there was no direct evidence showing that Ms. Beaufils knew of this fact and very little, if any, circumstantial evidence indicating that Ms. Beaufils had reason to suspect criminality but willfully took steps <u>not</u> to acquire the knowledge to confirm her suspicions. The lack of incriminating evidence supports this Court's exercise of discretion under the fourth prong of plain-error review. Given the very real possibility that the jury found Ms. Beaufils guilty on all sixteen counts of conviction based upon the Government's improper explanation of deliberate ignorance and the court's failure to charge the jury on the correct law, a reasonable citizen would have a diminished view of the judicial process and its integrity if this Court refused to correct the district court's plain error.

**B. The district court erred by imposing a two-level enhancement at sentencing for obstruction of justice.**

### Pertinent Facts

After the jury found Ms. Beaufils guilty of sixteen of the seventeen counts in the indictment, United States Probation prepared its Initial Presentence Investigation Report (PSR). (Doc. 106). Ms. Beaufils thereafter submitted her objections to the report and Probation prepared its Final Presentence Investigation Report (Doc. 110), with an Addendum that included Ms. Beaufils' objections, the Government's Response to the objections, and Probation's recommendations.

In the PSR, Probation recommended that Ms. Beaufils receive a two-level enhancement for obstruction of justice, pursuant to USSG §3C1.1. (Doc. 110, ¶ ¶ 30, 41). According to Probation, Ms. Beaufils "falsely testified at trial that she was only responsible for conducting a 'chart review' and that the patients were being seen by doctors and the durable medical equipment was recommended by each individual doctor." (Doc. 110, ¶ 30). The PSR asserted that Charlene Frame, owner of Royal Physician Network, who employed Sherley Beaufils, "testified that such was not true and the defendant was never advised of such." (Doc. 110, ¶ 30). Accordingly, Probation was asking for a two-level enhancement pursuant to Application Note 4(B) to USSG §3C1.1 for Ms. Beaufils allegedly "committing, suborning, or attempting to suborn perjury." (Doc. 110, ¶ 31). Applying the two-level enhancement, Probation calculated Ms. Beaufils' Total Offense Level to be

26 for counts two through twelve. (Doc. 110, ¶ 45). With a total offense level of 26, the guideline range was 63 to 78 months of imprisonment.[3]

As noted in the Addendum to the Final Presentence Investigation Report: "Ms. Beaufils objects to the probation officer's assertion that she obstructed the administration of justice by her allegedly having committed perjury at trial. Ms. Beaufils testified only to her subjective belief and intent concerning her alleged criminal conduct in this case, which the Government did not refute with concrete evidence, but rather only the self-serving testimony of Ms. Charlene Frame, a convicted felon and admitted fraudster, who received remarkable leniency in a related prosecution in exchange for her cooperation with the Government." (Doc. 110, Addendum, page 2).

The Government recommended that the court overrule the objection to the enhancement and Probation agreed. According to the Government's argument, Ms. Beaufils committed "plain and simple perjury" by testifying that she saw the treating physician's name when she clicked on a patient's file in DMERx. (Doc. 110, Addendum, page 2). The Government claimed that Ms. Beaufils' testimony was rebutted, not only by the testimony of Charlene Frame, but also by the fact that the final chart and record generated by DMERx, after Ms. Beaufils had completed her review, listed her as both the treating medical provider and the ordering medical practitioner for the DME and did not have the names of any other

---

[3] Without the enhancement, the total offense level would have been 24, with a guideline range of 51 to 63 months of imprisonment for these counts.

physician or medical practitioner. As further proof of the alleged perjury, the Government argued that, when Ms. Beaufils was cross-examined at trial regarding her statements to an FBI agent when she was first questioned about her orthotic brace orders, she "told the FBI agent that she was calling patients and performing examinations on the phone, rather than mere chart review." (Doc. 110, Addendum, page 3).

Probation's Response to this objection in the Final PSR was as follows: "As the Government noted in its response, the facts presented at trial contradict what the defendant testified to during the course of the trial. Further, the jury clearly accepted the facts as presented, based on the defendant's conviction as to sixteen counts of the Superseding Indictment. The probation officer submits that the 2-level enhancement for obstruction of justice is appropriately applied in this case." (Doc. 110, Addendum, page 3). Both parties thereafter filed their respective Sentencing Memorandums in the case (Doc. 117, 118), in which they each addressed the applicability of the two-level obstruction-of-justice enhancement, essentially asserting the same arguments set out in the Addendum to the Final PSR.

At her sentencing hearing, Ms. Beaufils once again objected to any enhancement for obstruction of justice, and each side set out their respective arguments regarding the propriety of the enhancement. (ST-9-12)[4].  The district

---

[4] Citations to the transcript of the sentencing hearing are set out herein as "(ST-page number)."

court overruled the objection and applied the two-level enhancement for obstruction of justice, finding as follows: "On the whole, Ms. Beaufils simply lied to the jury. That was my impression at the time, and, obviously, it was the impression which is by necessity included in the jury's verdict with respect to many counts." (ST-14). The court found that Ms. Beaufils had not simply denied her intent but "had made a specific and wholesale denial of the actual criminal acts," which testimony was "incrementally modified, altered or withdrawn as the case may be when on cross examination she was confronted by prior inconsistencies." (ST-13). Ms. Beaufils now shows that the district court erred, not only in its application of the obstruction-of-justice enhancement, but also in its findings as to the commission of perjury.  For such reasons, she moves this Court to set aside her sentences for counts two through twelve of the indictment.

### Law and Arguments

United States Sentencing Guideline Section 3C1.1 provides that, (1) if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, a two-level enhancement applies. U.S.S.G. § 3C1.1. Application Note 4 to the guideline sets out various types of conduct to which the enhancement would ordinarily apply, including "committing, suborning, or

attempting to suborn perjury." U.S.S.G. § 3C1.1, Application Note 4(B).

Conversely, Application Note 5 contains examples of conduct which ordinarily

would not warrant the enhancement, including "making false statements, not under

oath, to law enforcement officers, which statements do not significantly impede the

investigation or prosecution." U.S.S.G. § 3C1.1, Application Note 5(B).

The Application Notes to the guideline also contain an express warning

regarding the use of purportedly false statements as the basis for an obstruction

enhancement. "In applying this provision in respect to alleged false testimony or

statements by the defendant, the court should be cognizant that inaccurate

testimony or statements sometimes may result from confusion, mistake, or faulty

memory and, thus, not all inaccurate testimony or statements necessarily reflect a

willful attempt to obstruct justice." U.S.S.G. § 3C1.1, Application Note 2.

Because an obstruction-of-justice enhancement would increase the offense level,

the Government has the burden of proving its applicability. See *United States v.*

*Bailey*, 961 F.2d 180, 181 (11th Cir. 1992). In considering whether a district court

erred in imposing the obstruction-of-justice sentencing enhancement, this Court

reviews the court's factual findings for *clear error* and reviews the application of

those findings under the sentencing guidelines *de novo*. *United States v. Doe*, 661

F.3d 550, 565 (11th Cir. 2011).

First, Ms. Beaufils shows that she did not commit "perjury" at trial as

contemplated by U.S.S.G. § 3C1.1 and as found by the district court. The

Government and Probation each claimed that some of Ms. Beaufils' testimony was proven to be false by the testimony of Charlene Frame at trial. This simply is inaccurate. Aside from the fact that Charlene Frame was a convicted felon whose cooperation in Ms. Beaufils' trial resulted in a significantly lower sentence—mere home confinement and supervised release—her testimony never directly contradicted that of Ms. Beaufils.

Ms. Beaufils testified that she saw the name of the medical provider who had performed the exam when she clicked on a patient's name and chart on DMERx. (T-287). Frame simply testified that the name of the patient's primary care physician was not "required" to be on the DMERx chart and that she personally had not seen that particular block filled out. (T-324). However, there was no evidence that Frame ever reviewed a patient's file on DMERx. She was merely the owner of the company. Without evidence that Frame's job entailed reviewing the patient files on the portal, there would have been no reason for her to have ever seen the block on DMERx for the patient's primary medical provider—whether completed or not completed.

Frame also testified that she never told Ms. Beaufils that she was merely reviewing charts prepared by some other medical provider who had already examined the patients. (T-323). But, Ms. Beaufils never testified that Frame told her this. Instead, Ms. Beaufils testified that she had never even talked to Frame before their phone conversation shortly before she quit. Her only contact had been

44

with the recruiter for the company, Julixza Crim. It was Ms. Beaufils' testimony that Julixza Crim was the person who told her that she would be reviewing charts that had been prepared by physicians who had examined the patients. (T-278). The only thing Ms. Beaufils testified to regarding her phone conversation with Charlene Frame was that she asked Frame whether "the charts go back to the physicians in terms of like a final review because they have to sign off." According to Ms. Beaufils, Frame told her they did. (T-294). However, the Government failed to elicit testimony from Frame as to whether or not she made this statement. No testimony from Charlene Frame established perjury on the part of Ms. Beaufils.

Finally, the only remaining "proof" of perjury, according to the Government and Probation, pertained to the FBI interview that Ms. Beaufils gave early in the investigation, when Agent Dye showed up at her house to talk to her. As Ms. Beaufils testified, she willingly agreed to sit down at her kitchen table and discuss her employment by RPN with the agent. (T-311). Ms. Beaufils was not under oath during the interview, and she never signed an affidavit swearing to the truthfulness of her statements during the interview. On cross-examination, the Government first asked Ms. Beaufils if she was "telling a different story" as to how she was compensated by RPN, from what she told Agent Dye, because she purportedly had told the agent that she was paid $25 for each chart review *that resulted in an order for DME*. (T-311). While Ms. Beaufils admitted telling Agent Dye that she was only paid if the review resulted in an order for DME, this was not

a false statement and was in accordance with her testimony at trial. At trial, she testified that each chart had an accompanying DME order. If she ultimately approved the chart, which meant she approved the order, she was paid for that review. If there was any problem with the chart or the order, she would not approve it and she was not paid. Only approved charts, meaning they included approved DME orders, resulted in payment. Her testimony at trial regarding payment did not conflict with what she told Agent Dye.

The Government also claimed, as set out in the Addendum to the Final PSR, that Ms. Beaufils told Agent Dye she "was calling patients and performing examinations on the phone, rather than mere chart review." Unfortunately, the transcript of the FBI interview is not part of the record on appeal. When Ms. Beaufils testified on cross-examination that her job was not to call the patients, the Government accused her again of changing her story from what she said during her FBI interview. (T-313). As Ms. Beaufils explained at trial, she could have called the patients if needed and could have asked them to perform certain maneuvers, but her job was simply to review the files. (T-314-315). This was what she thought she was explaining to Agent Dye during the interview. When he asked her how it was possible to even do a certain maneuver over the phone, she answered his question. (T-316-317).

There is a distinct possibility that Ms. Beaufils was nervous having an FBI agent in her home asking her questions and confused by the agent's questions.

While there may be some inconsistency between Ms. Beaufils' trial testimony and her FBI interview as to whether she called any patients—although it is impossible to tell to what extent without the transcript of the interview—it simply does not rise to the level of perjury. This is exactly what the guidelines warn against in applying an obstruction of justice enhancement based on alleged false statements or testimony: "Inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

While a district court's finding that a defendant committed perjury is to be given due deference, *United States v. Williams*, 340 F.3d 1231, 1241 (11th Cir. 2003), the court's finding that Ms. Beaufils committed perjury on the stand was clearly erroneous, as the record simply does not support the finding. Since the finding of perjury was clearly erroneous, the application of the obstruction-of-justice enhancement was also erroneous.

**C. The evidence was insufficient to support the verdicts as to all sixteen counts of conviction and was so tenuous as to the key element of intent that it would be a manifest miscarriage of justice for the convictions to stand.**

### Pertinent Facts

At the close of the Government's case, counsel for Ms. Beaufils made an oral Rule 29 motion for judgment of acquittal, arguing that the Government had failed to prove intent to commit, or the knowing and willful elements of, the

charged offenses. (T-270). The district court denied the motion. (T-271). Ms.

Beaufils then put up her case, which consisted solely of her testimony (T-276-320),

and the Government put up Charlene Frame as their rebuttal witness (T-321-326).

Counsel for Ms. Beaufils failed to renew the Rule 29 motion at the close of all of

the evidence. (T-327). Ms. Beaufils now shows that the evidence at trial was

insufficient to sustain her convictions; therefore, she moves this Court to set her

convictions aside.

### Law and Arguments

Ordinarily, this Court "reviews *de novo* whether sufficient evidence supports

a conviction, viewing the evidence and taking all reasonable inferences in favor of

the jury's verdict." *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013).

However, when the defendant moves for a judgment of acquittal at the close of the

Government's case but fails to renew the motion at the close of all of the evidence,

this Court will reverse the conviction "only where doing so is necessary to prevent

a manifest miscarriage of justice." *United States v. Doe*, 661 F.3d 550, 565 (11th

Cir. 2011). A manifest miscarriage of justice means that either that the record is

devoid of evidence of an essential element of the crime or that the evidence on a

key element of the offense is so tenuous that a conviction would be shocking."

*United States v. Waters*, 937 F.3d 1344, 1356 (11th Cir. 2019).

**Health Care Fraud**

Ms. Beaufils was convicted of five substantive counts of healthcare fraud, in connection with five of the patients whose files she reviewed on the DMERx portal, for which claims ultimately were made to Medicare for the DME. A person commits health care fraud when that person knowingly and willfully executes, or attempts to execute, a scheme to defraud a health care benefit program, including Medicare, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, the health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347. The defendant "must be shown to have known that the claims submitted were, in fact, false." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007).

As per 18 U.S.C. § 1347, to prove health care fraud, the Government must prove beyond a reasonable doubt that the person had knowledge of the fraud, acted willfully, and intended to defraud. The Government must prove more than an intent to deceive in order to prove an intent to defraud. *United States v. Takhalov*, 827 F.3d 1307, 1312-13 (11th Cir. 2016). To prove an intent to defraud, there must be an intent to harm, which means "to obtain, by deceptive means, something to which [one] is not entitled." *Id*. Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud. *Id*.

Ms. Beaufils shows that the Government failed to prove at trial that she had knowledge of the fraud or that she intended to defraud Medicare. As set out in the facts portion of this Brief, when Ms. Beaufils was hired by RPN, Julixza Crim told her that her job would be reviewing patient charts, promulgated by providers who had examined those patients and prescribed DME.  No one ever told her different. In its closing argument the Government argued that Ms. Beaufils' intent to defraud was evidenced by the fact that the final charts she approved listed her as the patients' medical provider and only had her name on the DME orders. However, Ms. Beaufils never saw those completed files. Ms. Beaufils worked through the digital portal only. She clicked on the patient's name, went through each portion of the digital file, including the chart, the attestation of medical necessity, and the DME order, and either approved the file or sent it back. The digital charts she saw on the portal had the patients' medical providers listed. She never saw any finalized charts, such as the ones provided to the FBI, that listed her as the treating provider and the ordering provider.

Ms. Beaufils also never saw the documentation submitted to Medicare on claims for patients whose files she had reviewed. It was not until she received a call from Cigna a year into her employment that she learned that she had been listed as the only medical provider on a claim. She knew this had to be a mistake because she knew she was not the medical provider for that patient and knew that, as a nurse practitioner, she could not write DME orders except under the

supervision of a physician. She also was aware that Medicare would not even pay a DME claim for an order written by a nurse practitioner who was not under the supervision of a physician. (T-140).

RPN contacted Ms. Beaufils based on her credentials as a nurse practitioner and engaged her in what appeared to be an authentic and genuine hiring process supported by credible corporate structure, emails, phone calls, documents, and contracts. Ms. Beaufils accepted the job to supplement her current income as a nurse practitioner and did not know that the charts she proofread, which contained pages upon pages of lengthy and patient-specific narratives of injuries and recommended treatment were, in fact, fake. In short, Ms. Beaufils was defrauded by the same people who developed the complicated and persuasive scheme to defraud Medicare out of millions of dollars. By their verdict of acquittal on the conspiracy charge, it is clear that the Government's evidence relating to Appellant's knowledge of or intentional participation in this broad and deep conspiracy simply wasn't there.

Even if the Government proved Ms. Beaufils intended *to deceive* others by electronically signing her name to the patient charts, the Government failed to prove intent to *defraud* anyone. Ms. Beaufils always believed that the final charts had to be signed off on by a reviewing physician; otherwise, any claim would not be paid by Medicare. The lack of evidence of intent to defraud makes the healthcare fraud convictions shocking and a manifest miscarriage of justice, as

contemplated by *Waters*, supra. For this reason, this Court should reverse her five convictions for health care fraud.

**Remaining Counts of Conviction**

Ms. Beaufils was also convicted of conspiracy to violate the anti-kickback statute and to make false statements relating to healthcare, as well as five substantive counts of making false statements relating to healthcare matters. These offenses each have "knowing" and "willful" elements that the Government needed to prove in order to support any conviction. A person violates 18 U.S.C. § 1035 for making false statement relating to health care if the person **knowingly and willfully** falsifies a material fact in connection with the payment for health care benefits. A person is guilty of conspiring to make false statements relating to health care if the person **knowingly and willfully** joins in an unlawful plan with others to make such false statements and there is some overt act taken in furtherance of the plan. 18 U.S.C. § 371. A person violates the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1), if the person **knowingly and willfully** receives any renumeration as payment in return for referring an individual to a person for the furnishing or arranging for the furnishing of an item or service that could be paid for by a health care program. A person is guilty of conspiring to violate the anti-kickback statute if the person **knowingly and willfully** joins in an unlawful plan with others to violate the statute and there is some overt act taken in furtherance of the plan. 18 U.S.C. § 371.

Just as Ms. Beaufils had no knowledge of the health care fraud being perpetrated by RPN and had no intent to participate in the commission of health care fraud, it follows that she did not commit the above offenses either knowingly or willfully. Ms. Beaufils testified that at all times, she believed that she was reviewing charts prepared by medical providers who had examined the patients. This was what she had been told by Julixza Crim. Her job description was to review and approve, or not approve, the charts and orders for accuracy, inconsistencies, and the appropriateness of the DME ordered for the patient's complaints. She was not aware that the patient records were falsified and had no reason to be aware of this. Once she approved the digital charts and orders, she never saw them again. Specifically, she never saw DME orders with only her name on them and never saw the final charts listing her as the medical provider who performed the exams.  It would be a manifest miscarriage of justice to let these convictions stand; therefore, Ms. Beaufils moves the Court to set them aside.

Lastly, Ms. Beaufils was convicted of five counts of aggravated identity theft. A person commits aggravated identity theft, in violation of 18 U.S.C. § 1028A, when the person knowingly possesses or uses another person's means of identification without lawful authority during and in relation to another felony. In Ms. Beaufils' case, the Government charged her with committing aggravated identity theft during and in relationship to making false statements relating to health care. Ms. Beaufils' guilt on these five counts is wholly dependent on her

guilt for the five counts of making false statements relating to health care. If this Court concludes that the evidence was insufficient to support the convictions for making false statements, then Ms. Beaufil's convictions for aggravated identity theft must be set aside.

### D. The district court abused its discretion by denying the motion for new trial on the ground that the defense failed to show excusable neglect for the motion being untimely.

#### Pertinent Facts

The jury returned its verdict finding Ms. Beaufils guilty of sixteen counts of the indictment on February 1, 2022. After the return of the verdict, the district court advised as follows:

> There are some motions that are provided for by the Fed. Rules of Crim. Pro., of which Mr. Lowther is very well aware. It is customary to advise you that you can file certain motions within 14 days, but that is largely overridden by the fact that judgment will not be entered until you are sentenced at a proceeding to be conducted sometime later after the preparation of the Presentence Investigation Report.

(T-408). Ms. Beaufils and her husband thereafter expressly asked trial counsel Joshua Lowther to file a motion for new trial on her behalf. On Tuesday, February 8, 2022 at 7:09 PM, Ms. Beaufils sent a text message to Mr. Lowther. In the text, she implored him: "I need motion for a new trial filed. ASAP please. Its (sic) been a week already, there were (sic) evidence that were (sic) not presented… Please this is my life on the line here. If you are too busy to help me please let me

know…" (Doc. 135). Mr. Lowther responded: "I'm not too busy to help you, of course. There are no grounds for a motion for new trial; we preserved the issued (sic) for appeal on the motion for judgment of acquittal. There won't be any action in the case other than the presentence investigation until sentencing, which will be several months later. Then the appeal." (Doc. 135).

At a minimum, Ms. Beaufils invoked two needs with her text: (1) that she wanted to file a motion for new trial; and (2) she had a claim for ineffective assistance of counsel for failure to use the "evidence . . . not presented." Unfortunately, Mr. Lowther's reply was non-responsive to Ms. Beaufils' claim about his failure to present evidence. He took no other action in regard to her request and did not file the requested motion for new trial.

Thereafter, Ms. Beaufils hired undersigned appellate counsel to represent her in an appeal of her convictions and sentences. Appellate counsel filed a Rule 33 Motion for New Trial on Ms. Beaufils' behalf on September 22, 2022, understanding that it was not timely and asserting excusable neglect as the reason for the district court to accept the filing out-of-time (Doc. 135). Ms. Beaufils maintained in the motion that she had expressly asked her trial counsel to file a motion for new trial within a week of her conviction and that counsel's refusal to do so, coupled with his failure to instruct Ms. Beaufils how to pursue that relief, constituted the "excusable neglect" contemplated by Rule 45(b)(1)(B) for the court

to accept the otherwise untimely Motion for New Trial. (Doc. 135). The R. 33

Motion raised two substantive claims of error warranting an evidentiary hearing

and the granting of a new trial: (1) the district court's plain error in failing to

instruct the jury as to the accurate law concerning the concept of deliberate

ignorance, and (2) numerous allegations of ineffective assistance of trial counsel.

The district court denied the motion without reaching the merits of the

claims. Instead, the court concluded that Ms. Beaufils had not shown excusable

neglect for the untimely filing of the motion. (Doc. 147). The district court abused

its discretion by denying the Motion for New Trial on this procedural basis.

## Law and Argument

Rule 33 of the Federal Rules of Criminal Procedure provides that any

motion for a new trial grounded on any reason other than newly discovered

evidence "must be filed within 14 days after the verdict or finding of guilty." Fed.

R. Crim. P. 33 (b)(2). The Federal Rules provide, however, that a Motion for New

Trial which is filed beyond that time may still be accepted by the Court if the

proponent of the motion is able to establish "excusable neglect" as the cause for

the delay.

> Read in conjunction with . . . Rule 45(b), the defendant is . . . required
> to file a timely motion for a new trial under Rule 33(b)(2) within the
> seven-day period 3 specified. . . . [However], under Rule 45(b)(1)(B),
> if for some reason the defendant fails to file the underlying motion for
> a new trial within the specified time, the court may nonetheless

consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.

Advisory Committee Note to FRCP 33; see also, Fed. R. Crim. P. 45(b)(1)(B) (when an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect).

The United States Supreme Court has explained "excusable neglect" in regard to other federal statutes, as follows:

> . . . there is no indication that anything other than the commonly accepted meaning of the phrase was intended by its drafters. It is not surprising, then, that in applying Rule 6(b), the Courts of Appeals have generally recognized that "excusable neglect" may extend to inadvertent delays. Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect, it is clear that "excusable neglect" under Rule 6(b) is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant.

*Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 391-392, 113 S. Ct. 1489, 1496-1497 (1993). The Court held that "in determining whether respondents' failure to timely file was excusable, the proper focus is upon whether the neglect of respondents **and their counsel** was excusable." *Pioneer*, 113 S. Ct. at 1498–1499 (emphasis in original). In assessing the relevant factors of excusable neglect, the Supreme Court noted:

> Because Congress has provided no other guideposts for determining
> what sorts of neglect will be considered "excusable," we conclude that
> the determination is at bottom an equitable one, taking account of all
> relevant circumstances surrounding the party's omission. These
> include, as the Court of Appeals found, the danger of prejudice to the
> debtor, the length of the delay and its potential impact on judicial
> proceedings, the reason for the delay, including whether it was within
> the reasonable control of the movant, and whether the movant acted in
> good faith.

*Pioneer*, 113 S. Ct. at 1499.

Likewise, in *Cheney v. Anchor Glass Container Corporation*, 71 F.3d 848

(11th Cir. 1996), the Eleventh Circuit extended the "excusable neglect" analysis in

*Pioneer* to the timeliness of a motion to set aside a civil judgment, finding that the

district court abused its discretion in denying the motion when the late filing was

"due to excusable neglect by Cheney's counsel." *Id*. at 850. The conclusion was

based upon the Court's review of "all relevant circumstances" surrounding the

delay:

> The factors we must weigh include "the danger of prejudice to the
> [opposing party], the length of the delay and its potential impact on
> judicial proceedings, the reason for the delay, including whether it
> was within the reasonable control of the movant, and whether the
> movant acted in good faith.

*Cheney*, 71 F.3d at 850 (11th Cir. 1996).

Ms. Beaufils asked her trial attorney to file a motion for new trial. He

expressly rejected that request without researching the viability of it nor explaining

to her the deadlines, parameters, and need for a new attorney if she wished to raise

issues of ineffective assistance of counsel. These facts fit squarely within the

analysis from *Cheney*, *supra*, for the granting of an out-of-time motion for new trial:

**(1) The danger of prejudice to the Government**

Had the district court accepted the untimely motion, there would have been no prejudice to the Government. At the time, the direct appeal had not yet been filed. The case was not postured in such a way that the Government had already been preparing a response to other legal matters involving Ms. Beaufils. The time period was not so far extended from the trial and sentencing that the Government would have had to reacquaint itself with the facts of the case. In fact, most of the issues raised were already known or contemplated by the government.

**(2) The length of the delay and its potential impact on judicial proceedings**

For the same reasons acceptance of the motion would not have prejudiced the Government, the timing would not have prejudiced the judicial proceedings. Additionally, the district court would be the § 2255 court. Raising the issues of ineffective assistance of trial counsel in a motion for new trial rather than a § 2255 motion would have favored judicial economy.

**(3) The reason for the delay**

This factor should have been attributed to trial counsel for his non-responsive answer to Mrs. Beaufils' timely request (within 6 days of her being found guilty) and his failure to file or aid her in filing a motion for a new trial. Ms. Beaufils is not a lawyer; she has not been educated in appellate law or

procedure. Denying the out-of-time appeal, when it contained legitimately justiciable errors at the first opportunity, ignored the responsibility of the trial attorney and, instead, placed a burden upon a non-lawyer defendant to understand that she had been given insufficient, inadequate, or outright incorrect legal advice.

This is particularly true given the odd and somewhat confusing wording of the district court's instructions regarding post-conviction motions. As the court told her, while it "is customary to advise you that you can file certain motions within 14 days . . . that is largely overridden by the fact that judgment will not be entered until you are sentenced at a proceeding to be conducted sometime later after the preparation of the Presentence Investigation Report." (T-408). The court never told her that she had fourteen days to file a motion for new trial or that right would be forfeited.

In the Order denying the motion, the court found that although Ms. Beaufils had expressly asked trial counsel to file the motion on her behalf within a week of the jury's verdict, his failure to do so did not constitute excusable neglect based upon the following:

> Mr. Lowther responded that he did not believe there were grounds for a motion for a new trial but that he would appeal the conviction in due course. Defendant's new counsel disagrees with Mr. Lowther's assessment of the case and looks to label his failure to file a motion for new trial as ineffective, thereby allowing the Court to conclude there is excusable neglect. The Court will not second-guess Mr. Lowther's intentional decision to not file a motion for new trial, and this is not the proper vehicle to litigate an ineffective assistance of

counsel claim. Besides, to the extent that Mr. Lowther was in error regarding his assessment of the case, the Eleventh Circuit has stated in the context of using Rule 45(b)(1)(B) to extend the time lime of Rule 33 that "[c]ounsel's misunderstanding of the law cannot constitute excusable neglect."

(Doc. 147, p. 3).

The court was correct to the extent that "an attorney's misunderstanding of the *plain language of a rule* cannot constitute excusable neglect such that a party is relieved of the consequences of failing to comply with a statutory deadline." *Advanced Estimating System, Inc. v. Riney*, 130 F.3d 996, 998 (11th Cir. 1997). In the *Riney* case, the trial attorney mistakenly believed that he had ten days from his receiving notice of the entry of the judgment to file his post-trial motions, rather than ten days from the actual entry. Because of his failure to understand the pertinent rules, counsel thought that the period for filing a notice of appeal had been tolled until the district court disposed of his post-trial motions. He was mistaken, and his notice of appeal was filed late. The *Riney* Court found that the lawyer's misunderstanding of the applicable procedural rules did not constitute excusable neglect. *Riney*, 130 F.3d at 998-999.

Unlike the facts in *Riney*, Ms. Beaufils' trial counsel did not "misunderstand the law." There is no indication from his email that he thought he had more than fourteen days in which to file a motion for new trial. Instead, he decided on his own to forego his client's instruction to him to file a motion for new trial, based upon his assessment of the case. If trial counsel believed there were no legitimate

grounds for which to file a motion for new trial, he still owed Ms. Beaufils a duty to resolve the conflict in a manner that would not materially prejudice her rights, such as advising her that he could withdraw and she could obtain substitute counsel to file the motion on her behalf—and by reminding her that the motion had to be filed no later than February 15, 2022. See generally, Georgia Rules of Professional Conduct 1.2, 1.16. His failure to do so resulted in an untimely motion for new trial that was denied by the district court based upon trial counsel's disregard of the duties he owed to his client.

The district court abused its discretion by finding an absence of excusable neglect based upon the attorney's "misunderstanding of the law" upon which it based the denial of Ms. Beaufils' Motion for New Trial as untimely.

## CONCLUSION

For all of the reasons set forth herein, Appellant Sherley Beaufils respectfully asks this Court to overturn her convictions and sentences in this matter.

This 2nd day of December, 2022

s/ Laura D. Hogue
LAURA D. HOGUE
State Bar No.786090
Attorney for Appellant
Hogue Griffin
341 Third Street
P. O. Box 1795
Macon, GA 31202-1795
(478) 750-8040 telephone
(478) 738-0859 facsimile
laura@hogueandhogue.com


s/Jason B. Sheffield
JASON B. SHEFFIELD
Georgia State Bar No. 638719
Attorney for Appellant
Peters, Rubin & Sheffield, P.A.
2786 N Decatur Rd Ste 245
Decatur, GA 30033
(404) 296-5300
jasonsheffieldattorney@gmail.com

## CERTIFICATE OF COMPLIANCE

The principal portions of this brief do not exceed 13,000 words, in compliance with Rule 32(a)(7) of the Federal Rules of Appellate Procedure.

## CERTIFICATE OF SERVICE

I certify by my signature that I have served a copy of this Certificate of

Interested Persons upon the United States Attorney's Office for the Southern

District of Georgia by filing in CM/ECF to:

Justin G. Davids
Chief, Appellate Section
Assistant United States Attorney
Post Office Box 8970
Savannah, Georgia 31412

This 2nd day of December, 2022.

s/Laura D. Hogue
LAURA D. HOGUE
Georgia State Bar No. 786090
Attorney for Appellant
Hogue Griffin, LLC
341 Third Street
Post Office Box 1795
Macon, GA 31202-1795
(478) 750-8040
laura@hogueandhogue.com